### KIBADEAUX v. STANDARD DREDGING CO.
#### No. 7929.

Circuit Court of Appeals, Fifth Circuit.

Feb. 3, 1936.

Rehearing Denied Feb. 29, 1936.

H. C. Hughes and J. W. Lockhart, both of Galveston, Tex., for appellant.

Byron Economidy, of Galveston, Tex., for appellee.

Before FOSTER, SIBLEY, and WALKER, Circuit Judges.

SIBLEY, Circuit Judge.

Kibadeaux libeled the steam dredge Burlington in admiralty for a personal injury. On stipulated facts the libel was dismissed for want of jurisdiction. The question on this appeal is whether a deck hand on a dredge engaged in cleaning the slips in Galveston harbor navigated by ships in interstate and foreign commerce, who was injured while at work by defects in the appliances of the dredge, may libel the dredge in admiralty, or must claim under the Federal Longshoremen's and Harbor Workers' Act (33 U.S.C.A. § 901 et seq.), or under the State Employees Compensation Act (Vernon's Ann.Civ.St.Tex. art. 8306 et seq.); he having applied for compensation under the last-named act and received some of it, but the payment being voluntary and not under an award or by virtue of any contract of settlement. The District Court held that the Texas law applied.

█ The first defensive contention to be considered is that the libelant Kibadeaux, whatever his original right may have been, is now estopped to claim otherwise than under the state Compensation Law. The apposite facts are that he was injured September 5, 1934; his employer, Standard Dredging Company, reported the accident to the State Industrial Accident Board on September 17; the board mailed out claim blanks the next day; and Kibadeaux, being still in the hospital, filled them out and returned them on October 2d. On October 15th, the board gave notice of the claim to the insurance carrier, and stated it would set the matter for hearing unless payments were begun within twenty days. The carrier reported a first payment on October 22d. It thereafter until September 4, 1935, regularly honored weekly drafts, seemingly drawn by the employer, for the amount which would be owing under the state law, about $600 being paid for 52 weeks. Payments for 400 weeks would be due under the law for a permanent injury. Meanwhile, on Jan. 7, 1935, counsel employed by Kibadeaux wrote to a representative of the carrier, stating his employment to prosecute the matter before the board or in the courts, but that Kibadeaux was then satisfied with what he was receiving; "however, we ask that you do not make any change in the plan of liquidating any liability the carrier may have until you first give us some notice. If there is any change that we or Mr. Kibadeaux desire, we will of course communicate with you personally prior to taking any action before the Board." The same counsel, without more, brought the libel on August 1, 1935. We find nothing here to estop Kibadeaux from asserting his remedy in admiralty, if he has one. His employer, Standard Dredging Company, who has claimed the dredge as charterer and is now litigating with him, really fathered the activity before the Industrial Accident Board by reporting the accident to it. The board has never taken any action whatever on the claim filed upon the blanks it sent to Kibadeaux. There was no hearing, no award, no compulsion of payment. The employer through its arrangements with its insurer has made payment of $600 to Kibadeaux on account of his injury, but not upon any contract of settlement or as a final accord and satisfaction. The payments are, like any others made pending suit, to be credited on the claim. There was no abandonment by the employer and his insurer of the right to contest the claim of Kibadeaux, and no obligation assumed to continue the payments. The letter of Kibadeaux's counsel shows that each party was supposed to be free at any time to upset the legal armistice. Neither contract nor adjudication stood in the way. Even where there had been an agreement for compensation approved by the commissioner and payments made under it there was held to be nothing to prevent an action if the injury were truly not under the commissioner's jurisdiction. Hoffman v. New York, etc., Railroad Co. (C.C.A.) 74 F.(2d) 227, citing Larscy v. T. Hogan & Sons, 239 N.Y. 298, 146 N.E. 430.

█ The question therefore recurs whether Kibadeaux has a remedy in admiralty in view of the state Compensation Act and the Longshoremen's Act. The competition between these three jurisdictions often pre-

sents a puzzle. The agreed facts show that Standard Dredging Company had taken proper steps to place itself under each of the two last-named acts so far as they may be applicable, and it appears that their dredging operations included from time to time not only work in established waterways, but also the making of new ones. The latter kind of work done by a dredge, as well as that done merely to improve the shore, this court has held not to be so related to navigation as to bring employees while engaged in it under admiralty jurisdiction. United Dredging Co. v. Lindberg (C.C.A.) 18 F.(2d) 453; Fuentes v. Gulf Coast Dredging Co. (C.C.A.) 54 F. (2d) 69. Indeed, injuries occurring on waters which are to become navigable after the dredge cuts a channel, but which have never been navigated before, could hardly be said to occur on navigable waters at all. The cited cases, however, were rested on the vexing distinctions made in Southern Pacific Co. v. Jensen, 244 U.S. 205, 216, 37 S.Ct. 524, 61 L.Ed. 1086, L.R. A. 1918C, 451, Ann.Cas.1917E, 900, and since maintained by the Supreme Court, by which the admiralty jurisdiction over injuries on navigable waters may be intruded upon by state compensation laws if they do not contravene the essential purpose of an act of Congress or work material prejudice to the characteristic features of the general maritime law or interfere with the harmony and uniformity of that law in its international or interstate relations. What part the idea may play that Compensation Acts especially elective ones like that of Texas, enter into the contract of employment and amount to an agreement in advance to settle for injuries according to those acts, has not been fully determined in the federal courts. An elective Compensation Act was held to follow the employment into another state, and to afford the employer a defense in a suit in such other state for an injury suffered there, in Bradford Electric Light Co. v. Clapper, 286 U. S. 145, 52 S.Ct. 571, 76 L.Ed. 1026, 82 A.L. R. 696. This court discussed this power of an elective statute to follow the employment into another jurisdiction in Ford, Bacon & Davis v. Volentine (C.C.A.) 64 F. (2d) 800. The Supreme Court of Texas in Millers' Indemnity Underwriters v. Boudreaux, 261 S.W. 137, emphasized the elective and contractual character of the Texas Compensation Act, and held it to accompany a diver when he descended into navigable waters to inspect the piling of an abandoned shipway. The case was affirmed without discussion of the contractual element of the act as Miller's Indemnity Underwriters v. Braud, 270 U.S. 59, 46 S.Ct. 194, 70 L.Ed. 470. The Texas act was again involved in Employers' Liability Assurance Corporation v. Cook, 281 U.S. 233, 50 S.Ct. 308, 309, 74 L.Ed. 823. Cook's general employment was on land, and under the Texas act, and he claimed compensation under it for an injury received on navigable waters while he was temporarily engaged in unloading a ship. The Longshoreman's Act had not been passed. The Supreme Court held the state act did not follow Cook in his temporary work upon the ship, saying: "Under the circumstances disclosed, the state lacked power to prescribe the rights and liabilities of the parties growing out of the accident. The fact that the Compensation Law of the state was elective in form does not aid the respondents. The employer did not surrender rights guaranteed to him by the federal law merely by electing to accept one of two kinds of liability in respect of matters within the state's control, either of which she had power to impose upon him." Three justices concurred solely on the ground that Cook, when employed in unloading the ship, was a seaman within section 33 of the Merchant Marine Act, 46 U.S.C.A. § 688, and that state legislation was excluded as to persons within the scope of that act. It appears to be settled that the cited section of the Merchant Marine Act did deal generally with the rights of injured seamen, giving them new rights and remedies and modifying the admiralty law of the United States, whether administered in a Court of Admiralty or at the seaman's election in a court of common law. Lindgren v. United States, 281 U.S. 38, 40, 50 S.Ct. 207, 74 L.Ed. 686; Baltimore Steamship Co. v. Phillips, 274 U.S. 316, 317, 324, 47 S.Ct. 600, 71 L.Ed. 1069. Where it applies, state statutes are excluded. Lindgren v. United States, supra. If that act does not directly deal with the seaman's ancient right to libel his ship for injury caused by her unseaworthiness, it certainly has not prejudiced it. See Baltimore & Ohio R. R. Co. v. Zahrobsky (C.C.A.) 68 F.(2d) 454. The later act of Congress, the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. §§ 902, 903, of course modifies further the general admiralty law of the United States in so far as it concerns persons who, like longshoremen, were seamen under the for-

mer law, but are put under the latter by its terms. But the Longshoremen's Act expressly excludes from its coverage "the master and members of the crew of any vessel." We consider that if Kibadeaux was a seaman under the general admiralty law as reshaped by the Merchant Marine Act, and was also a member of the crew of a vessel, his injury on navigable waters in his employment about his vessel is cognizable in admiralty, and is controlled neither by the Longshoremen's Act nor by the Texas statute. London Guarantee & Accident Co. v. Industrial Accident Commission, 279 U.S. 109, 48 S.Ct. 296, 73 L.Ed. 632; Robins Dry Dock & Repair Co. v. Dahl, 266 U.S. 449, and cases cited on page 457, 45 S. Ct. 157, 69 L.Ed. 372.

The agreed facts are as follows: The dredge in question was duly enrolled as a vessel of the United States, first at Duluth when built, and later at New York as her home port, and remeasured at Tampa, Fla. Her permanent certificate shows length 149.3 feet, breadth 42.3 feet, capacity 351 tons gross. Her license for coasting trade names her master, and has been annually renewed at New York, New Orleans, and Galveston. The dredge has no motive power of her own, but is capable of being towed at sea from place to place, and has been so towed for the purpose of filling dredging contracts at various ports. She has a deck, carries her own engines and machinery for dredging, has sleeping quarters for her men and a galley and messhall. When Kibadeaux was injured, the dredge had on board beside the master named in the license, called "superintendent" by the Dredging Company and "captain" in common parlance, six engineers, five oilers, four firemen, four levermen, six mates, twenty-four deckhands, five cooks and helpers, a timekeeper and a civil engineer. None but the master were required by law or the company's regulations to have licenses or certificates as seamen. Kibadeaux had none. The men were paid bimonthly wages and fed on the dredge, but could at their option go ashore after working hours to spend the night. Kibadeaux had been several times employed as a deck hand, with duties as a general helper, both in New Orleans and Galveston; the last time at Galveston. The dredge was afloat in Galveston Harbor, and engaged in cleaning out and deepening the slips of the Southern Pacific Terminal Company, in which slips vessels plying in coastwise and foreign commerce were habitually moored. The silt was stirred up by a steam-operated revolving cutter, sucked up by steam pumps and deposited on the shore through a pipe line supported on pontoons. Kibadeaux was injured while at work on one of the pontoons by a defective winch, rendering the dredge unseaworthy as he claims.

The injury occurred on navigable waters and is normally under admiralty jurisdiction. The Merchant Marine Act 1920, § 33, 46 U.S.C.A. § 688, altering the admiralty law of the United States touching injured seamen, speaks of "any seaman who shall suffer personal injury in the course of his employment," giving to such a choice of remedies which choice includes his former remedies in admiralty. The term seaman as there used has been very broadly interpreted as including the master of the vessel, Warner v. Goltra, 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254, and stevedores while unloading the ship, although they do not work on the ship more than on land and do not go with her to sea at all. International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157; Northern Coal & Dock Co. v. Strand, 278 U.S. 142, 49 S. Ct. 88, 73 L.Ed. 232; and even though the stevedores be unloading a foreign ship. Uravic v. F. Jarka Co., 282 U.S. 234, 51 S.Ct. 111, 75 L.Ed. 312. We think this deck hand, permanently employed on the vessel and quartered there, under duty to aid in navigating her at sea while going from harbor to harbor, or in maneuvering her while at work in a harbor to prevent maritime collisions as well as to accomplish her work, which itself is to facilitate the entry and exit of vessels of commerce, is a seaman. Dredge cases so holding and awarding the men on them maritime liens for wages are Saylor v. Taylor (C.C.A.) 77 F. 476; McRae v. Bowers Dredging Co. (C.C.) 86 F. 344; The Hurricane (D.C.) 2 F.(2d) 70, 71, affirmed (C.C.A.) 9 F.(2d) 396; Butler v. Ellis (C.C.A.) 45 F.(2d) 951. So also the dredge, at least until taken out of all connection with navigation and commerce, is a vessel 1 U.S.C.A. § 3. She is enrolled and licensed as such. She has been navigated from port to port around three sides of the United States. She has carried her machinery and her complement of men with her, thus transporting them. When Kibadeaux was hurt she was using no scows in her work to carry the dredged materials, a circumstance which has caused a question in some of the deci-

sions, but the final holdings have been that a dredge without scows, while engaged in improving navigable waters at least, is a vessel subject to maritime liens, not only for wages according to the cases just cited, but also for supplies. Bowers Hydraulic Dredging Co. v. Federal Contracting Co. (D.C.) 148 F. 290, affirmed (C.C.A.) 253 F. 870; Charles Barnes Co. v. One Dredge Boat (D.C.) 169 F. 895, and cases supra. A dredge, however, when operating merely for a land purpose, is held not subject to a maritime lien for supplies in Hydraulic Steam Dredge No. 1 (C.C.A.) 80 F. 545; J. C. Penny-Gwinn Corp. v. McArdle, 27 F. (2d) 324, 59 A.L.R. 1342. In Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L. Ed. 1047, 11 Ann.Cas. 589, a steam dredge accompanied by scows was in the employ of the United States, and one question was whether the men upon it were "laborers and mechanics" within a federal hours of labor statute. By comparing the majority opinion with the dissent, it will be seen that the debate was really whether they were seamen because of their employment on a vessel. In 206 U.S. 246, on page 258, 27 S.Ct. 600, 602, 51 L.Ed. 1047, 11 Ann.Cas. 589, it appears that deck hands and cranemen were under discussion. On the following page, it is said: "But the argument does not stop with masters of tugs, or even with mates, engineers, and firemen of the same. * * * The scows and the floating dredges were vessels. * * * They were within the admiralty jurisdiction of the United States. The Robert W. Parsons (Perry v. Haines) 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73. A number of cases as to dredges in the circuit and district courts are referred to in Bowers Hydraulic Dredging Co. v. Federal Contracting Co. [D.C.] 148 F. 290. Therefore all of the hands mentioned in the informations were seamen within the definition in an earlier statute of the United States. * * * They all require something of the training and are liable to be called upon for more or less of the services required of ordinary seamen. * * * Whatever the nature of their work, it is incident to their employment on the dredges and scows, as in the case of an engineer or coal shoveler on board ship." As against a regulatory city ordinance, a dredge was held to be a vessel and her engineers seamen in Los Angeles v. United Dredging Co. (C.C.A.) 14 F.(2d) 364. This dredge was a vessel and Kibadeaux a seaman and a member of her crew. An injury to him by the unseaworthiness of the vessel was cognizable in admiralty. Neither the Longshoremen's Act nor the state statutes apply. Miller's Indemnity Underwriters v. Braud, 270 U.S. 59, 46 S.Ct. 194, 70 L.Ed. 470, is strongly relied on as to the contrary. It was decided before the Longshoremen's Act was passed. Braud was injured while working as a diver on the bottom of Sabine river inspecting work which he was to do on certain piling. He was not employed on any vessel nor a member of its crew. A small boat served him as a tender to furnish him air in his work, but he was the principal thing and it an accessory. He was no seaman on a vessel.

The judgment dismissing the libel for want of jurisdiction is reversed and the cause remanded for a trial upon the merits.

Judgment reversed.